v. United Healthcare of Tennessee, Inc. I would like to request three minutes for rebuttal, please. Your Honors, may it please the Court, my name is Chris Hines and I represent the appellant in this case, United Healthcare of Tennessee, Inc. Your Honors, the final order of the District Court in this case is due to be reversed simply because United had a reasoned basis for its decision that Janie Butler did not meet the planned criteria for substance abuse residential treatment on February 18, 2005. You need look no further in the administrative record than the actual criteria, which is at AR 110, and the note from United's initial reviewing physician, Dr. Charles Freed at AR 133. The criteria reads like this, and by the way, this is the first criteria, which is the criteria on which the District Court based its opinion. The criteria says this, history of continued and severe substance abuse despite appropriate motivation and recent treatment in an intensive outpatient or partial hospital program. Dr. Freed's note on AR 133 says this, attending physician indicates that member has not been in intensive outpatient or partial hospitalization level of care within the past three months. She was in IOP in September for a few days and left against medical advice. She seems to have had insufficient motivation. Members now attending groups seems more motivated. In speaking directly with the attending physician in this case, Dr. Charles Freed makes two things an issue, recency and appropriate motivation. In talking about motivation, he states that earlier, which was five months before Janie Butler had been in a treatment program and had relapsed four times and had eventually left when she was lifted to the next level of care, which was partial hospitalization, she left against medical advice. That's shown on AR 122. As a matter of fact, Mr. John Butler, her husband, is the one who actually called the facility and stated that she was not going to return because she wasn't ready for treatment. When Dr. Freed reviews the case, he looks and he talks to the attending physician, and by the way, this is the only material in the administrative record from Janie Butler's attending physician at Sierra-Tucson, talks to the attending physician and says, okay, she wasn't motivated for treatment before, but now we are seeing that she's participating in groups, having been through detoxification, and she is appropriately motivated for treatment. Therefore, let's try her at intensive outpatient and see how that goes this time with appropriate motivation. Sierra-Tucson had requested residential treatment. The levels of treatment are sort of in five levels, it's an oversimplification, but residential treatment would be level 4, being next to the highest level of care as far as the supervision, and intensive outpatient would be level 2. It looks like she needed level 4. Well, in this particular case, according to the plan criteria, the reason why she didn't need level 4 is that the criteria are built around the AMA guidelines, and what they say is that for substance abuse, although it might seem like more is better, the least restrictive level of care that will provide the support that they need at the time is what is the appropriate level of care. In this particular case, you know, you're not the one that did all this, but I mean, this record is ridiculous. I mean, the number of mistakes made by your client, I mean, I really can't understand the district court's impatience with what was going on here. I mean, I take it you agree there were some serious mistakes made during each of these reviews. I agree that there were mistakes made with this procedure, there's no question about that. The wrong guideline, not having the record, having her treating physicians, I mean, those cut to the core of the whole point. They're nine years in, no one can dispute this woman had a serious problem. No, your honor. And that never has been a dispute. The dispute was simply on this particular day at this time when she finished detoxification, what was the appropriate level of care under the plan? And according to the plan criteria on 07-8, it is absolutely... It seems so easy. Why couldn't you get the right physician stuff in the record, account for the treating physicians and what they were really saying, and then respond to it? It just seems... I don't know. I really understand that, in fact, one can make the argument the district court judge was too patient. This should have ended long ago. Well, in this particular case, your honor, you have... In substance abuse treatments, it's dissimilar to things like disability. So the question is, what's the person's condition right now? And not was it a week ago, a month ago, but what's their condition right now and what do they need? And according to United, Dr. Freed had the information he needed because he talked directly to the attending physician at the time. And that particular decision is the question. Was there a reasoned basis for his decision at the time? The procedural errors that you're talking about, by the way, three independent reviewing physicians all agreed with Dr. Freed and they all mentioned the motivation issue. So yes, along the way, there were procedural issues, but it didn't ultimately mean that... What's so bad about a rule that says, listen, yes, you get an incredible amount of deference in interpreting your own plan and that's all well and good, that's just the way it works. But that at some point, when you can't seem to get your ducks in a row the right way, you've got someone who you just acknowledge has a very serious medical problem, you just say, enough is enough. I mean, the mistakes were your fault, they weren't her fault, and this has just gone on way too long. Well, and the mistakes were procedural in nature and when the... Exactly. So enough with the deference. I mean, when you make that many mistakes, why defer anymore? Well, because ultimately the decision was not wrong and that was determined in the final review by two additional physicians. The question again, and there's no question, Your Honor, and I'm not here trying to say that there were no procedural problems here. What I am saying is under the law, under the law here, United made the right decision, there's a reasoned basis in the record and the procedural issues that went on along the way were eventually corrected. Do we wish they hadn't happened? Absolutely. I guess your way of looking at it is you assess the application the day it's filed and then you are allowed to ignore everything that happens, jump forward nine years, and if by the end of nine years, United actually does get its ducks in a row, does have five physicians, does account for her treating physicians, does finally apply the right guideline, all is forgiven. That's basically it. Basically under the law, that is it, Your Honor. If the decision is correct, you have... Why is it going to be so hurtful to other health care companies, insurance companies to say, no, that's not how we're doing it? When you make this many procedural gaffes and you've got someone that everyone agrees needed the treatment from the beginning, some serious treatment from the beginning, you know, you had your shot at administering this in a fair way with deference to you. Well, we did and in the process, what we would like to have seen would have made it a lot easier is if there had been materials added to the record by the plaintiff that did anything to change the original analysis between the two physicians, between Dr. Marla Perry, the attending physician, and Dr. Charles Freed. The treating physician supported the claim? No, there weren't. The treating physician that treated Jenny Butler at Marla Perry, there is nothing in the record from her. The materials that were added were not from the treating physician at Sierra-Tucson. So in your normal situation where you go, well, here's what Dr. Charles Freed said, he marks it in his note, he's speaking directly to the attending physician. You all talked to the treating physician? Yes, we did. At Sierra-Tucson?  At Sierra-Tucson. At Sierra-Tucson. That's exactly who Dr. Charles Freed was speaking to when he made the call. But none of the materials that were added were from that attending physician and they didn't contradict anything that Dr. Charles Freed had heard from her on the front end. So you have a UnitedHealthcare physician, a reviewing physician, speaking directly to Jenny Butler's attending at Sierra-Tucson. And that's AR-133. AR-133 and 134, yes. And then what are the other two docs? Well, there actually were a total of five reviewing docs. And in the materials that Mr. Butler put in, you have one letter from the medical director at Sierra-Tucson that generally describes what happened during residential treatment. You have a one-paragraph letter from an outpatient physician from Knoxville who had seen her off and on and a second letter from him. You have a letter from the collections person at Sierra-Tucson that says, and this is six and a half years after the fact, saying, you need to pay for this treatment. She deserved it. And stating in that letter, we're providing records with this letter for you to review  No records came with that letter. And you also have a letter from a treating professional and addiction specialist, not a physician, at a halfway house and recovery group center that apparently Jenny Butler talked to. None of those people could speak to Jenny Butler's condition on February 18th when she finished detoxification. Only her attending could speak to that. And that's the very information that United got. And they didn't get any information. You referred us to page 134. And in that, there's a statement. This is by Freed. And there's a statement, the patient does not have a history of prior failed treatment at the partial hospitalization or intensive outpatient levels of care. Is that correct? Yes. Well, it's qualified on the page. This is a continuation of the note that starts on 133. And what he says is, within the past three months, she hasn't had treatment in the past three months. He references her treatment five months before when she left against medical advice. And mentions the motivation issue. But that's qualified by the statement before. What does the motivation issue really mean here? Your Honor, the motivation issue- Maybe just to tell you where I'm coming from. Yes, Your Honor. I mean, I get the point that a person without motivation, whatever the type of treatment you're giving them, there's a reason to be worried that nothing good will come of it. So I get that point. Yes, Your Honor. But doesn't a lack of motivation kind of cut the other way when it comes to going to a place like Tucson? Like, isn't that kind of the point? To get them away from some of the bad influences in their lives? Even just the setting in which they've been living and abusing alcohol? And so I guess I'm trying to figure out how that plays into the services she really requested and it seems to me really needed. Right. Yeah. The motivation issue. One of the issues why it seems like more would be better in residential, in this kind of a setting, is that you would think that isolating the person and getting them away from the influence would be best. Yes. Actually, the approach by the American Psychiatric Association, it's listed on AR 296 by the Final Reviewing Physicians, says the more that you can get the person in the community that they're going to be living in while they're getting the treatment, the better chance there is for success. That clearly was not working. Well, actually the residential treatment didn't work either because two weeks later you can see in the administrative record that Janie Butler was requested. No, but the proof of this isn't whether she got cured. The point is do you ramp up the level of treatment? So clearly the community-based approach wasn't working. So that's, just because Tucson failed doesn't mean she wasn't eligible for it. Well, but that goes back to the motivation issue. The whole, Dr. Freed's whole point here is trying to establish the proper level of care. She didn't have motivation apparently before, now she does. The issue isn't let's get her in the highest level of care, let's start her where we think she needs to be. If she fails, then we'll ramp it up. What is United's position as an administrator? United is the claims administrator in this case, which basically means that they coordinate care and they coordinate the payment for actual medical treatment that occurs. And is there some document that calls them the claims administrator? There is not. There's a document that states that they are not the plan administrator. And that document is the plan? That's the plan and it is 0, make sure I'm right, 077 in the administrative record. 077. Yes. Okay. And you're a red light design, so if there are any other questions. Thank you. Your honors, my name is James Wright, I'm an attorney from Knoxville, Tennessee, practicing law there for some 34 years now. I think Judge Sutton started it out exactly right, except for they never got it right. When you look at, when I first discussed this with Mr. Butler, this looked like a game, but it was with somebody's life. In terms of, when you read their- What's the answer to the point why your client didn't put on the treating physician from Tucson? Well, what they did, this takes a little bit, and I apologize because I ought to go straight to it. In February of 06, when the administrative, Mr. Butler is appealing, at the time that he is appealing, he writes a letter. He's already requested that they provide him the records. They tell him no. He calls up, it's in their administrative record, and they refuse to give him, say go get him from the hospital. How does he get the records from the hospital that they reviewed, if they're saying we've reviewed over and over and over again, we've reviewed medical records? He does that on February 06, when he tells them I'm going to appeal, I want the records, I want the criteria, and I'm going to submit additional evidence. Before he can do any of that, on February 22 of 2006, they already have had Dr. Clementi review and find against him using the wrong and more stringent criteria, before he can even get the records and before he can do anything. On March 1st, he receives what they claim to be, what they reviewed, and it's the wrong criteria, but he doesn't know it. I think we showed at the first part of the argument that we understood the mistakes they made. Just give me a quick answer. Why? What he did. If she, your client does have the burden of showing that this care was required, and they do face a tough standard of review. It is. All right. Here we go. Maybe their point is, you know, yes, they made mistakes, but so did you. No. Here we go. They submit from the referring physician to Sierra Tucson, the doctor that made the referral that says she needs to go. Okay, but then why wouldn't it be helpful to have the person treating her at Tucson? Going to that too, is that, now, the first doctor who makes the referral saying she needs to go, says specifically she failed an intensive outpatient treatment. She failed. That's why I'm making the referral there. He then submits the medical director from Sierra Tucson. Now remember Sierra Tucson. What I hear you saying is we didn't do it because we didn't need it. That's your point. Well, no, we submitted. You have to remember Sierra Tucson has been paid in full. There's no monetary incentive for them to do anything one way or the other. He got a letter reviewing the entire chart from the medical director of Sierra Tucson and supplied it as part of the record. So he did what he could in terms of getting what he could. He could have provided the chart, couldn't he? I think that he could have prepared it. He could have, but by submitting a summary of the records, and if you look at what the doctor said, summarizing the records, this is at page 274 and 275, this is the Sierra Tucson. Now this is Casey Thorpe, and I don't have the page reference. The actual medical director writes, and I may have to supplement, but the actual medical director writes and says the same thing. At 275, Ms. Butler has failed outpatient therapy with Dr. Jobson, outpatient alcoholics and honest men, discharging against AMA from Ridgeview, intensive outpatient program. She binged drinks four to five times per day, drank six to seven vodka drinks per episode with blackouts and no recollection of her events. She endorses using Xanax, and he ends up going treatment at the residential medical health care level, providing the necessary instruction, emotional safety was necessary. He submits the referring doctor, who again details that she had previously tried and the way in their records when they're saying that we knew that, they're wrong, because they say that she left after a few days. The Ridgeview records, which they don't include in the record either, but from their own claims notes that are here, they note that not only had she failed, but that her situation was, and here's what they say, it's at page 123 to 125, exactly 123, that she had relapsed, this is from their claims notes that are already there, that she had relapsed four times, even in intensive outpatient. She had failed after almost a month of inpatient outpatient. The situation they describe, United describes, is grim. She needs a more intensive level of care, needs the structure and integrity of a higher level of care. She is at a higher risk of relapse, and this is at the end of her completion of 28 to 30 days at Ridgeview, and in no place does any of their reviewers discuss or go into why isn't that pertinent to why this person doesn't need after they're saying that she needs a higher level of care. One of the things that bothered me, and I agree procedurally there are huge problems, but medically, if you're using the wrong criteria, and they use the wrong criteria all the way through, they've never, I don't think, if you look at it, even in their last review, the one by Clementi where they said, it's amazing, when this record closes, they've used the wrong criteria. Only after the filing of the lawsuit do they claim, we've discovered we used the wrong criteria, we're going to do another review, but we're not going to tell you that you can use that record, we're just going to go ahead and do it. Is the correct criteria the one that they refer to on AR 110? Yes. Now, what's interesting in their administrative record that they filed with the court, they don't tell the court then that there's actually another administrative record or record that they had produced to Butler that had the wrong criteria. So if Butler is going to be submitting any materials during an appeals process, he's got the wrong criteria, not only does he have the wrong criteria, but the treating doctor has the wrong criteria, who's already been paid. Sierra-Tucson has the wrong criteria. So throughout this process, nobody has the right criteria. It's seven months into the lawsuit that they, for the first time, go, we used the wrong criteria, but it's interesting, if you look at Dr. Clementi's review, Dr. Clementi doesn't follow the criteria, he, in essence, criticizes the criteria, if you look at the second page of it, he says even though she has failed outpatient care, that doesn't mean she wouldn't do better again, basically. He in essence is acknowledging she failed it, which is the criteria, but then says well maybe she could do it again. That means she won't again. Can I ask you to turn to the award of statutory penalties and address United's argument that they weren't the planned administrator when it comes to that phrase and the way it's used when it comes to penalties as opposed to an administrator when it comes to discretion over what the plan means? So what do you say to that? I would say that in their hundred page plus plan document that says on it it's United's plan document, that this law firm went out and bought an insurance policy from United. Throughout the entire policy, it describes United as the administrator. Well where does it describe, I'm... On page 76 of the record, when it says what we are, they say we help finance, well they didn't help finance this plan, the plan's paid for by the law firm. Or administer. Pardon, yes, and they administered it, and that's what they say they are. No place do they restrict their role and say we're a claims administrator, and after saying on that page when they're describing their role, they go on and talk about how they administer it, how they have the absolute discretion, total power, total control to administer it. That seems to be the key thing which I'm interested in your reaction and the appellant's reaction. So the statute says, defines the administrator as the quote, person specifically so designated by the terms of the instrument under which the plan is operated, end quote, or if an administrator is not so designated, the plan's sponsor. Now you would agree the law firm's the plan's sponsor, right? I think the plan, the law firm in that particular section is described as the employer. Yeah, okay, so we're on the same page. And I take it your way of looking at the statute is to say, well, if United gets discretion over what the plan means, that's enough to call them an administrator for purposes of deferent, that deference, but it's also enough to call them a plan administrator for purposes of this statute 1002 section 16. I think that's, is that your basic point? That's not my point. Okay. I don't think that's what the case law says. That's the way the statute, I believe, personally reads, but that's not what the case is saying. I have to go with what the case law says. Okay. The, I believe that what they did is for a hundred and some odd pages, and in particularly in the page where they're asked what their position is, they said they were an administrator. They didn't define themselves as a claims administrator. Yeah, but I mean, if, that's not very helpful if it's possible you can be an administrator for purposes of deference over what the plan means, but yet not be, quote, the plan administrator under 1002. See what I'm saying? I do see what you're saying. And I want to add to it is that my feeling about it is if this were an employee-employer situation and somebody's trying to say I was an independent contractor, and if my relationship said, you know, employer-employer-employee relationship, but the contract in six words said I am not an employer, you're an independent contractor, the court would look at the totality of the document and go, you said you were the administrator. You didn't limit your role and say, well, we're just a claims administrator. You exercised complete control and deference. And then throughout the... I don't see that. I mean, if you're, if there's two different ways of thinking of the term administrator, I just don't understand why you're calling it estoppel or you've already conceded this when they're distinct, they're terms that can have distinct meanings, and it's a fair reason to think why they might use the term for the reason relating to deference as opposed to the reason of being, quote, the plan administrator. I think what, if you look at the regulations, and they've been, this court has cited them many times, I think Judge Moore's written some opinions that have it recited in it, where the regulations talk about a plan administrator has a duty to furnish the information, which by the way was not furnished in this case, the 29 CFR section 2560.503.1G, where it says that the plan administrator, specific duty of the plan administrator is to give a specific reason as to the adverse benefit decision. Well, the only person in the world that had the ability to do that was United. They have to give the specific reason or reasons for the adverse determination. The only entity that could do that was United, not Butler, Vines, and Babb. They have to give reference to a specific plan provision in which the determination is based. United is the only entity that can do that. If an internal ruler guideline is used, they have to set it forth and describe it, which this company never did, by the way. And in terms, and that's important not just to the procedure, but it's important in terms of that they never, that the criteria was satisfied by the medical proof submitted, and that they never, ever showed a rational basis that it was, if you can follow that. So you can have a situation where the employer, the law firm in this case, is the, quote, administrator, right? We would agree with that. That can happen. Yeah, you could. If that, okay. So, and if that happens, and the employer, the law firm has this insurance company, United out there paying the claims, who then gets, you still have United making the calls as to whether someone is disabled or needs this or that medical service, right? You wouldn't say the law firm now is the one that gets deference over what the plan means, wouldn't you? No. You would. In fact, the case law talks about that the very purpose of 1132C is to make sure that the, that the plan administration, United in this situation who is carrying out all of these functions, furnishes, it says in the history set forth in the Allender case, that the purpose of it is so that the plan beneficiary can be aware of the details of the findings. And that's the purpose of 1132C. And that's the purpose of this regulation is, as it says, that the plan participants have access to the information they need to protect their interests. Well, there's no other way to implement this. What's happened is, is United, in this procedure, you know, they flat out tell Mr. Butler earlier, we're not going to give it to you. The reg says that the plan administrator has to, and that's what's unique to me is, is the regulation talks about a plan administrator shall provide these things, and then it says. Where is there anything that says that United is the plan administrator? I think throughout their pleadings, they go through and say we're. It's not in the plan, it's in their pleadings. Well, I think in the pleadings they do it, and in the plan, I don't know if you describe yourself as the administrator and that you say we have all control, that you can now disclaim because you say six words on page 77 of a 100 page document. On page 77, I don't really see what they were pointing to, frankly. I don't see, and that's why I'm curious from both of you, where in the plan is there anything saying administrator, whether it's claims administrator or plan administrator. Now, you pointed on page 76. Yes, on page 76. There's a statement, we help finance or administer the enrolling group's benefit plan. Yes. But otherwise. And if you'll turn to the next page, if you'll follow on down, buried away, let's see, top left hand corner, when the enrolling group purchases, Butler, Vines, and Babb is the enrolling group, purchase the policy under the benefit plans. We are not the plan administrator or named fiduciary of the benefit plan. So that's saying that United is not the plan administrator. Yes, and then they go on in interpretation on the next page and we have this own exclusive discretion and that we may delegate this discretionary authority to other persons or entities on page 78 who provide services in regard to the administration of this policy. So in regard to the administration of this policy, which is the plan, they are the administrator. There's nobody else administrating this policy. Well, but what do you, you've pointed out this language on 77. When the enrolling group purchases the policy to provide coverage under a benefit plan governed by ERISA. So that happened here. Yes, the law firm bought an insurance plan. We are not the plan administrator. That seems, it's in tiny letters so that I missed it, but it seems pretty clear. Well, I guess what you have a problem with is that in the previous page they described themselves as administering the plan and then on the page afterwards they say that we have the ability to assign and whatever the administration of the plan. That's what gets me back to if they wanted to make sure to somebody they could have said we're only a claims administrator. And again, throughout this case they have taken the posture we are the plan administrator and as the plan administrator we're entitled to determine the administrative record. When you say that, your main argument in your briefs and I think still today has been about what they said in their pleadings and their use of the word administrator, right? And plan administrator, but I think it carries through from the beginning. I'm just making the point. You conceded if they were the claims administrator they would be right on this statutory penalties point and I'm just saying when you don't have the adjective claims in front of administrator in all their pleadings, it doesn't mean it's a concession that they're a plan administrator. I don't understand that point. Actually, I guess for purposes of Sixth Circuit, which of course you all are doing, there is a case law that I concede that says that if you're the plan administrator, the plan whatever it is, there are cases of course the court is very familiar with with the First, the Fifth, and the Ninth Circuit that say control is the factor. I'm thinking it's, if you look at what happens and you look at the regs and in terms of what makes sense, if the plan administrator, the insurer that sells this plan to the law firm can by bearing away six words on page 77 of a plan say, by the way, we're not the plan administrator, but for a hundred pages talk about how we are the administrator and we have the sole power. Administrator of claims. They don't never say claims. They just say. I mean, that's the point. I know. You don't know what the missing adjective means. Well, we don't, yeah, and I agree with you, but my point is that if you do this, there is no teeth whatsoever, as the Supreme Court originally said is the purpose of 1132, which was to provide some teeth. There is no teeth in this. There are no teeth in this situation, and I'm out of time, and I don't want your honor to have to stop me. I'm going to quit. Thank you very much for your patience. I appreciate it, and I apologize for not getting to it. Your honors, as you pointed out earlier, there were many procedural mistakes in this case, and it's not to fund to have to admit that, but that's the truth. However, I don't want the court to be misled that certain things were wrong that weren't. There were some procedural things along the way, but the opposition just said that we used the wrong criteria throughout the entirety of this case. That's inaccurate. There's one single time that the first independent reviewer reviewed the case under the wrong criteria. We caught that, supplied him with the right criteria, and he re-reviewed the case. That's the only position. Did you provide the correct criteria to the claimants here? What happened at the... No. The answer is no at the beginning. He got it when we filed the administrative record in this lawsuit. So how would any normal person know what they needed to provide in order to make a proper claim if you don't give them the right criteria? Your honor, until they have the right criteria, they can't. So you're setting them up for failure? Well, not by intent, your honor. We sent criteria. Well, I understand you're not meaningfully bad, or intentionally bad. But it seems to me, just thinking about yourself as a patient, if you don't know what you're supposed to show, and it's one of these complicated areas like alcohol treatment, how on earth can you rightfully prevail? Well, I think you're spot on, your honor. And that's why... And again... You say filing the record, you have it right, but you didn't point it out to her. You didn't say... I mean, it sounds like your point in terms of the defense to this is, okay, fine, we gave them the wrong information about the guidelines here and what to do, but that was corrected when the administrative record was created. Was the change pointed out? Yes. Mr. Butler knew the residential criteria when the record was filed. And there were... Three and a half years later, he had the opportunity to put anything in the record he wanted to. So it was not ideal. Let's go to the statutory interpretation point on penalties. So you heard that discussion. How do you... Can you enlighten us on this? Yes, your honor. This is under the law, under ERISA, they're claims administrators, plan administrators. We specifically say we're not the plan administrator, and under Sixth Circuit law, if no plan administrator is named, then the employer... I take it it is possible to be the claims administrator, not the plan administrator, but still be the one that gets deference about what the plan means. Yes, your honor. That's correct. Is that true throughout the country or just in the Sixth Circuit? I believe that. I can't speak to that. I believe it's true throughout the country, but I can't speak specifically to that. So you took us to AR 077, which I'm very careful... Actually, 078, I think, your honor. I hope I'm... I thought you said 77, and on 77, there's in very tiny print, we are not the plan administrator or named fiduciary of the benefit plan. Yes. Okay. Is there any statement anywhere that you are the claims administrator? There's not, your honor. Is there any statement that anybody is the claims administrator? There's not, your honor. So is it fair to people who are buying a plan or people who are covered by a plan to have it be in such small print, we are not the plan administrator, with no declaration as to who is the plan administrator? Well, it may be small print. It's the same print used throughout the entire plan, and it's stated. It's a part of the contract, and it's not intended to be hidden. The point is just to lay out the terms for who does what, and for people who are familiar with ERISA law, at least, who the plan administrator, who the claims... Seven of them. Yeah. Excluding me. So here, the feature is it is a law firm that is buying the plan. It is, your honor. And so they should know that the default rule is that they are the plan administrator, that the law firm is the plan administrator, right? Well, they should know by reading the plan that United is not the plan administrator. But am I right that the default rule, when the plan says United is not the plan administrator and does not say that Smith & Company is the plan administrator or anybody else, that the purchaser of the plan is the plan administrator? The employer is. And the plan administrator, again, the distinction there is plan administrator think business type stuff, signing people up, the administrative type things. Claims administrator think medical benefits, think coordination of medical benefits, coordination of payment for medical benefits. What's the norm? So, I mean, we'll even just leave it at law firms. There are a thousand law firms with United. What is the norm? It depends on the policy, your honor. There is no norm. I'm asking what the normal policy does. Well, the normal policy for United, depending, and it does depend on the policy, but it is generally United and insurers like United typically are recognized as claims administrators. There are a number of cases we've cited in our brief that make this distinction. And you're typically not the plan administrator? Not typically, your honor. Typically the claims administrator. Is there a norm? And how about outside United to other folks that do insurance? The fact is, though, insurers can be plan administrators. It's not that they're excluded from doing so. I'm just saying I think for the norm. But I guess now the more I think about it, that's, you offer a bundle of services to your clients. Yes. And when you're a plan administrator, that's an additional service with an additional cost. That's correct, your honor. Because now you're going to be the ones that all the employees talk to. And I guess someone wants to save some money, they'll do that in-house and then they'll rely on you for administering the claims. That's correct, your honor. I see. So in this case, the district judge awarded $99,000 of sanctions against you as the plan administrator for failing to give the documents with the criteria to the individual involved. Is that right? That's correct. Okay. And you're saying that you, because you were not a plan administrator, you had no duty to provide the documents. No, your honor. I'm not saying that. What are you saying? What I'm saying is that we still, upon request, we're required to provide the criteria. That's under a regulation that is under 1133. Now here's the second reason. Let's just assume for the sake of argument that we were the plan administrator, which the plan says we're not. Case law is clear that the particular regulation that requires us to provide things like internal documents, statutory penalties under section 1132 are not available for a violation of regulation that implements section 1133. So in this case, even if we were the plan administrator, and the case law is clear on that, even if, it says, even if a plan administrator could violate section 1133, it couldn't be 1132 for that violation because they deal with separate things. 1133 deals with the plan itself, 1132 deals with the responsibilities of the plan administrator. The district court sanctioned us under 1132 for a violation of a regulation that implements 1133, and that was, that's under the law, that's improper. It's clearly improper. So it was both reasons. Thank you. Thank you both for your argument. The case will be submitted.